[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Department of Children and Families (DCF) has filed petitions to terminate the parental rights of the respondent mother, Margaret T., and the respondent father, Bernard N., to their three children, Bartholomew CT Page 16702 N., Karlene N. and Michelle N. The respondent father has moved to revoke the commitment of the children to DCF.
The father, Bernard N., was born in Haiti on December 4, 1963. His mother, a single parent, raised him. He came to the United States in 1980, at the age of sixteen. He attended high school in New York until the eleventh grade but did not graduate. In 1987 he moved to Connecticut to live with a cousin. He has a history of substance abuse that largely subsided in the mid-to-late 1990's.
The mother, Margaret T., was born on June 10, 1959 and raised in a nuclear family of five children in New Jersey. Her mother was treated for a psychological disorder. In high school Margaret had few close friends. Although she was not a good student, she graduated high school. Thereafter, she obtained a college degree in business and subsequently, in 1984, received an associates degree in environmental studies.
In the mid-1980s the mother began to seriously abuse alcohol. During this period she had her first out-patient psychiatric treatment. For a period of time she was treated with two antipsychotic medications. She found it difficult to work while taking the medications. In the late 1980s, she left her family and moved to Norwalk. She stopped taking medication and, her words, lived "between the shelter and the street." She subsisted on welfare and states that she "had a breakdown in the street."
The respondents met in Connecticut in the late 1980s. Although they never formally married, they have continued their relationship since that time. During much of their relationship, the mother has abused substances, particularly alcohol, and has suffered from schizophrenia.
On December 1991, a son, Bartholomew, was born to the respondents. The mother drank alcohol heavily during this pregnancy. On June 7, 1992, the Norwalk police found the mother lying on the ground drunk and unable to stand up. Bartholomew was in a stroller on the sidewalk. The police brought the mother to Norwalk Hospital. DCF placed a parent aide in the home to assist her. The father, however, did not get along with the aide and refused to permit her to continue.
On March 1993 a daughter, Karlene, was born to the couple. After Karlene's birth, DCF was again involved with the family. On February 1995, a second daughter, Michelle, was born. All three children are healthy and do not have special needs. The hospital assessment of the mother at the time of Michelle's birth reflects that the mother had a history of chronic alcoholism and multiple emergency room visits relating to psychiatric issues. CT Page 16703
On January 13, 1998, the family again came to DCF's attention because the respondents had failed to enroll Bartholomew in school.
In October 1998, the family was living with the father's mother in New York City. The father came home and found Margaret drunk and the children unfed. He proceeded to kick Margaret in the presence of Michelle. Margaret fled with Michelle. The father left Bartholomew and Karlene with his mother and, for the next several months, searched for Margaret.
After the respondent mother left the home with Michelle, she returned to Connecticut and was homeless. She reported to Connecticut authorities that she was fleeing the father because he had treated her violently for years.
The respondents and Michelle subsequently reunited in Connecticut. However, the mother was using substances and the father feared that Michelle might be in danger. In April 1998, a DCF social worker visited the home. She found the house dark and the mother incoherent. On April 7, 1999, DCF took custody of Michelle pursuant to a ninety-six hour hold. The court subsequently granted DCF an order of temporary custody. Thereafter, the paternal grandmother returned Bartholomew and Karlene to their parents in Connecticut.
On May 12, 1999, the mother arrived intoxicated at DCF's office for a visit with Michelle. She also was expressing suicidal thoughts. As a result, the mother was hospitalized for alcoholism and depression. On May 26, 1999, DCF took Bartholomew and Karlene into custody pursuant to an order of temporary custody.
The respondents were referred to the Morris Foundation, Inc. (MFI). On July 7, 1999, the mother submitted to a random urine screening that tested positive for alcohol. On August 28, 1999, MFI reported that the mother was attending scheduled sessions but was gaining little insight. She alternately denied then acknowledged that she had an alcohol abuse problem. She denied that she suffered from mental illness but also stated that she feared taking medication for it.
The father also attended sessions at MFI. MFI reported that he had a history of using cocaine and abusing alcohol, but minimized his use. He felt no need to abstain from alcohol. MFI further reported that the father made little progress in understanding the concept of addiction. He also had little comprehension of the mother's alcohol problem or her mental illness.
DCF arranged for the mother to undergo a psychiatric evaluation with CT Page 16704 Dr. David Krulee, M.D. and for both parents to undergo psychological evaluations with Dr. Robert Meier, Ph.D and Dr. Julia Ramos Grenier, Ph.D.
The mother presented herself to Dr. Krulee on May 24, 1999 with long straggly hair and a disheveled appearance that made her look much older than her stated age. She admitted that sometimes she drank three-quarters of a bottle of brandy a day. In one moment she would admit to having schizophrenia, then deny it. Throughout her interview with Krulee, her thought processes were vague and digressive. Her speech was also digressive and tangential, and included odd, extraneous and incongruous references. For example, she made multiple vague and digressive statements about possibly being addicted to spaghetti or to walking, stating that if a person kept walking his feet would fall off.
The mother also exhibited significant persecutory thoughts, at times reaching delusional proportions. However, she was heavily guarded and attempted to portray herself in a more favorable light. Her affect was frequently inappropriate and characterized by inappropriate laughing, smiling and odd relatedness.
In Dr. Krulee's opinion, the mother suffered from schizophrenia of the disorganized type. Her symptoms could wax and wain but the disease and some of its symptoms always were present. She also had a dependent personality disorder. Dr. Krulee recommended that the mother be prescribed antipsychotic medication.
Dr. Meier's findings and conclusions largely concurred with Krulee's. Meier met with the mother on July 20, 1999. As had Krulee, Meier had difficulty eliciting reliable information from the mother, and observed that "[m]any of her comments were vague and her thinking seemed to become disorganized quite frequently." According to Meier: "Mother shows clear signs of a chronic problem with alcohol dependency. She clearly has problems organizing and coordinating her thoughts. Her associations are vague and often irrelevant to the discussion. She drifts from one thought to another and the thoughts are frequently void of specificity or concrete content. Although sometimes aware of the inappropriateness of her thinking, [the mother] is only partially successful in redirecting her thoughts, and only for brief periods of time."
The mother related to Dr. Meier that the father believes she is not emotionally stable and will not "change her behavior." She related an incident in which she took her son for a walk and "was found in a stupor." She admitted that she has "gotten physical" with the children. She also related a history of mild seizures, suicidal thoughts, and memory loss. Notably, as Dr. Meier learned from the mother, she was the CT Page 16705 children's principal caretaker and had been for years.
Dr. Meier also evaluated the father, who was cooperative and responsive to questions and to the evaluation process. Meier did not find that the father suffered from any particular psychological condition. Although the father had some indications of depression, this was a product of DCF's taking his children.
Dr. Meier found that neither parent had much insight into their underlying problems. As he wrote in his report: "The relationship between the parents serves to meet each other's needs, but unfortunately in a rather destructive and unproductive manner. Each prevents the other from addressing the problems, as well as enabling the other to avoid critical issues."
Dr. Meier found that there was a bond between the parents and the children. In the parent-child interaction, he observed that both parents were appropriate with the children. However, he also found that "[t]he children, especially Karlene seemed to be rather parentified, especially in her relationship with mother. The child was aware of mother's limitations, and clearly felt some responsibility for the other siblings, especially Michelle. . . .
"The relationships between the parents and the children are clearly affected by mother's emotional and substance abuse problems, as well as the dysfunctional relationship between the parents."
On September 30, 1999 and October 19, 1999, Dr. Grenier. performed a neuropsychological evaluation of the mother. Dr. Grenier learned that the mother had been diagnosed with depression as well as alcohol abuse and had been hospitalized three times because of her emotional problems. In Dr. Grenier's opinion, the mother had a schizoid personality disorder accompanied by depression, although she found that the depression was related to the loss of her children.
On October 25, 1999, all three children were adjudicated neglected and committed to the care and custody of the commissioner of DCF. At the time of the commitment the court provided the respondents with specific steps to follow in order to regain custody of their children.[1]
On January 7, 2000, the mother submitted to a random urine test that was positive for morphine. On January 28, 2000 she tested positive for tetrahydrocannabinol (THC), a chemical contained in marijuana. Since that time her urine tests have been negative.
The father enrolled in various programs at Family Ties and Waterbury CT Page 16706 Youth Services. By the summer of 2000, he had attended all scheduled classes and had completed programs for anger management and family problem solving, "ages and stages — ages 4 — 6," and "ages and stages — ages 7-9." His visitation with the children, however, was inconsistent. By August 2000, Family Services of Greater Waterbury, where the father's supervised visitation occurred, terminated his participation in their program for two reasons. First, of fourteen scheduled visits, the father had canceled three, failed to appear for two and had been late for five. Second, even when the father appeared for visits, he did not engage the children nor did they seek him out for affection.
The mother, on the other hand, attended all visits and was generally appropriate and affectionate with the children. She also attended counseling at Family Service of Greater Waterbury. She attended all of the groups in which she was enrolled and actively participated in them. For the first five months of 2000, she appeared to be taking her medication.
However, by August 2000 she had stopped taking her medication. For this reason, she was discharged from a program at Waterbury Adult Behavioral Health. Without her medication, she was unable to stay focused and she engaged in what a family support worker at Family Service of Greater Waterbury characterized as "tangential conversation." For example, as that worker related: "During a visit, Bart told [the mother] and everyone in the visitation room that Karlene does not know how to cook, and that Karlene's cooking was poisonous. [The mother] began telling Bart about what poisons are, how poisonous things can be, and that poisons are the reason why people go to the hospital. Bart looked at [his mother] in a confused manner."
On August 29, 2000, Dr. Alok Bhargava, M.D., a psychiatrist, saw the mother. Dr. Bhargava observed that the mother was incoherent. Her thought process was poor and she did not make sense. She also claimed that she suffered from memory loss which Bhargava opined was likely secondary to her schizophrenia and history of substance abuse. However, he also opined that the mother did "not have any active neurological problems to deny her of parenting her children."
On September 5, 2000, DCF filed a petition to terminate the respondents' parental rights.[2] The trial of the petition to terminate parental rights and the hearing of the respondents' motion to revoke the commitment was consolidated. The case was tried to the court over four days.
Additional facts will be discussed as necessary. CT Page 16707
"Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re DanielC., 63 Conn. App. 339, 357, 776 A.2d 487 (2001). However, "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree off rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) In reStanley D., 61 Conn. App. 224, 230, 763 A.2d 83 (2000).
 I
With certain exceptions not applicable here, "[i]t is axiomatic that in seeking to terminate parental rights, the commissioner must prove by clear and convincing evidence that the department made reasonable efforts to reunify the parent and child as required by [the statute]. . . . The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Citations omitted; internal quotation marks omitted.) In re Daniel C., supra,63 Conn. App. 360-61.
DCF has referred the mother to Connecticut Counseling, MFI, Catholic Family Services, the Department of Mental Health, the Family Visitation Center, Waterbury Youth Services — Parenting Classes; Family Services of Waterbury; and Waterbury Hospital (Outpatient). In addition, DCF has recommended to the mother that she attend alcoholics anonymous and narcotics anonymous meetings. DCF has referred the father to the Family Visitation Center, Connecticut Counseling, MFI, Waterbury Youth Services — Parenting Classes, Family Services and Waterbury Hospital (Outpatient). DCF also provided both respondents with casework services, foster care and transportation.
In response to an inquiry from the court, both respondents acknowledged that they did not dispute that DCF had used reasonable efforts to reunite the family. By clear and convincing evidence, the court finds that DCF used reasonable efforts to reunite the parents with the children.
 II
DCF petitions to terminate the respondent's parental rights based on their failure to achieve sufficient personal rehabilitation. Failure of a parent to achieve sufficient personal rehabilitation is one of seven CT Page 16708 statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. General Statutes (Rev. to 1999) § 17a-112 (c)(3) (B), now (j)(3)(B). "That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) Inre Sheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001).
Although DCF has been concerned with issues of educational neglect, domestic violence and substance abuse in this family, the overarching and pervasive issue is clearly the mother's schizophrenia, her refusal to consistently take medication, and the father's lack of insight into the mother's condition. The mother stated that she does not like how she feels when she is taking medication for her schizophrenia. Her condition, however, cannot be controlled by therapy alone. Her mental illness contaminates her relationship with the father and with the children. Her children are aware of her illness and Bartholomew and Karlene are parentified because of her inability to properly care for them. Interacting with this schizophrenia is a depression, which at times manifests itself in suicidal thoughts, and a history of substance abuse. The mother's prognosis for maintaining long term sobriety is poor if she does not take medication. At the time of the filing of the petition, the mother had discontinued her medication, which she had taken for only a few months earlier in the year, and had discontinued mental health treatment generally. She had no insight into her mental illness.
"At the adjudicatory phase of the termination hearing, the ultimate issue faced by the trial court was whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than he had been at the time of the children's CT Page 16709 commitment." (Footnote omitted.) In re Hector L., 53 Conn. App. 359,367, 730 A.2d 106 (1999). Here, the mother was no better able to parent her children at the time of the filing of the termination petition than she was when the children were committed. Moreover, as Drs. Krulee and Meier opined, and as other evidence illustrates, the mother's prognosis for ever being the children's custodial parent is poor, even with the assistance of outside services, if she does not take her anti-psychotic medication. Indeed, she is likely to eventually relapse into alcoholism if she continues to refuse to take that medication.
Parental rights are not terminated because of a parent's mental condition nor because of her refusal to take prescribed medication, but because of the parent's inability to function as a parent. In re JessicaS., 51 Conn. App. 667, 673, 723 A.2d 356, cert. denied, 251 Conn. 901,738 A.2d 1090 (1999); In re Nicolina T., 9 Conn. App. 598, 606-607,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); see alsoIn re Kelly S., 29 Conn. App. 600, 608, 616 A.2d 1161 (1992). It is well settled, however, that the failure of a parent to take prescribed medication for a psychiatric disorder such as schizophrenia can lead to the termination of parental rights. State v. Anonymous, 179 Conn. 155,157-58, 425 A.2d 939 (1979); In re Antony B., 54 Conn. App. 463,735 A.2d 893 (1999); cf. In re Saba P., 13 Conn. App. 605, 538 A.2d 711, cert. denied, 207 Conn. 811, 541 A.2d 1241 (1988) (even with medication, mother unable to bond positively with child).
Subsequent to the filing of the petition,[3] as discussed more fully infra, the respondents continued to abstain from abusing substances. They also began couples' counseling, where they have made slow progress. The month preceding the trial of the case, the mother began taking medication for her psychiatric condition, specifically an anti-depressant, a mood stabilizer and an antipsychotic. She had refused to take such medication from the middle of 2000 to August 2001. The mother conceded under questioning from the court that she would stop the medication if she had an adverse effect from it. She testified that she has vomited and has had headaches from medication in the past. The court is convinced that the recent resumption of medication was pretextual, primarily for trial purposes, and disingenuous. Without the medication, the mother is unable to parent her children.
As of the date of the filing of the petition, the father had not completed anger management or domestic violence classes. Far more significant, however, is that he and the mother are a couple living together and the mother was the principal caretaker of the children. She would be again if the children were returned. For this reason, he "cannot be a competent parent to these children because [he] cannot provide them a nurturing, safe and structured environment." In re Ashley S., CT Page 1671061 Conn. App. 658, 667, 769 A.2d 718, cert. denied, 255 Conn. 950,769 A.2d 61 (2001).
By clear and convincing evidence, the court finds that each of the respondents has failed to achieve such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, either of them, alone or together, could assume a responsible position in the lives of their children.
 III
"If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase." In re Ashley S., supra,61 Conn. App. 665. "In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., 62 Conn. App. 307,315, 771 A.2d 160, cert. denied 256 Conn. 910, 772 A.2d 601 (2001). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev. to 1999) § 17a-112 (d) [now § 17a-112 (k)]." (Footnote omitted; internal quotation marks omitted.) In re Deana E.,61 Conn. App. 185, 190, 763 A.2d 37 (2000).
 A. Mandatory Findings 1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
As discussed supra, DCF timely offered both respondents services appropriate to address their issues.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
As stated supra, DCF made reasonable efforts to reunite the family.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirCT Page 16711obligations under such order.
On October 25, 1999 the court issued specific steps to the respondents, ordering that they: keep all appointments set by or with DCF, cooperate with DCF home visits, announced or unannounced, and visits by the children's' court-appointed attorney; keep their whereabouts known to DCF, their attorney and the children's' attorney; participate in parenting, individual and, when recommended by therapists, marriage counseling, and make progress toward the identified treatment goals. Those treatment goals included parenting classes. For the mother those goals pertained to mental health, domestic violence, self-esteem and parenting issues. For the father, the goals pertained to parenting, anger management classes, and domestic violence issues. The respondents were expected to submit to random drug testing and to successfully complete substance abuse treatment including inpatient treatment if necessary and to follow recommendations of service providers. For the mother, those service providers were Waterbury Hospital, Family Ties and Family Services of Waterbury. For the father, those service providers were Family Ties and Pam Pratt of Family Services of Waterbury. The respondents were expected to obtain and/or cooperate with a restraining/protective order and/or other appropriate safety plan as approved by DCF to avoid further domestic violence incidents, if necessary; to secure and/or maintain adequate housing and legal income; to avoid substance abuse; and to have no further involvement with the criminal justice system. In addition, the mother was ordered to cooperate with Medication Management Program; cooperate with Michelle's therapist and to follow any recommendations regarding the need for family therapy. The father was ordered to cooperate with the office of adult probation or parole officer and to comply with the conditions of his probation or parole.
Because the respondents, prior to the filing of the petition, had withheld permission from DCF to contact certain service providers and because DCF did not seek a court order authorizing such contact, the court is unable to ascertain the respondents' compliance with the court's specific steps as of the date of the filing of the petition. Notably, it is the petitioner's burden, not the respondents' burden, to prove the facts of the case, including whether the respondents complied with the specific steps.
There is no evidence that the respondents did not keep substantially all of their appointments with DCF, nor that they did not comply with DCF's home visits. Also, they kept their whereabouts known to their attorney. They failed to keep their whereabouts known to DCF for a brief period between June and July 2000. This was an immaterial omission. CT Page 16712
Both parties have completed substance abuse counseling at MFI. The father also completed a ten week course of early intervention. As of the date of the termination petition, it was not likely that the father would return to chronic drug abuse. Indeed, it is unclear that he had even used drugs in the year preceding the filing of the neglect petition.
The mother also completed drug treatment at MFI. Her prognosis for permanent or long-term sobriety is not good because she has failed to take her psychiatric medication and continue mental health treatment. Although she began taking the proper medication in the month before the trial commenced, she conceded that she would stop the medications if she had an adverse effect. The court is convinced that the recent resumption of medication was pretextual. The mother will eventually stop taking the medications, and, as a result, she will likely return to drug abuse.
The father has not successfully completed domestic violence or anger management classes. He had submitted to random urine screens, all of which were negative.
The mother did complete domestic violence and parenting classes. DCF failed to establish whether the mother had completed individual counseling.
The respondents' home is adequate.
The mother made progress in counseling for her sobriety and has been sober for over a year. She completed an intensive program for substance abuse but not the recommended outpatient program. She has not made meaningful progress in counseling for her mental illness. Between June 2000 and August 2001 she refused to take medication for her schizophrenia and depression. She lacks insight into why her children were removed from her custody.
In August 2000, DCF referred the respondents to "couples counseling." They had nine sessions of such counseling at Waterbury Youth Services between October 2000 and January 2001. Their counselor, however, was unable to opine whether they had made any progress on their issues because they had not been in counseling long enough. On March 20, 2001, the respondents resumed couples counseling at Catholic Family Services. The respondents have kept their appointments and actively participated in counseling sessions. According to their counselor, they have made progress, albeit slow progress.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of theCT Page 16713child for at least one year and with whom the child has developedsignificant emotional ties.
The children are bonded to their parents. This is especially true of Bartholomew. In the last nine months he has expressed a desire to return home. He wishes to see his parents more often, especially his father.
The father has little insight or sensitivity into his daughters' needs. During a supervised visit with the children in December 2000, the father told them that they would be returning home in a matter of months. Karlene expressed a preference to remain with her foster mother. The father called her "stupid" in response. Karlene was understandably upset by the incident and has been in counseling ever since. She has not visited with her father since the incident.
The children have been in the same foster home for two years. The foster mother is a widow and a high school graduate with two middle aged children of her own. She does not use alcohol or illicit drugs nor does she smoke cigarettes. She owns a three bedroom home. The foster mother is actively involved in her church and engages the children in church-related activities.
There is reciprocal affection between the children and the foster mother, to whom they refer as "Mama T." The foster mother is closely bonded with Karlene and Michelle. She is clearly willing to adopt all three children but was ambivalent about providing them with long-term foster care. The respondents elicited evidence that the foster mother posed financial questions to DCF when discussing the possibility of adopting the children.[4]
 5. Finding regarding the age of the child.
Bartholomew is 9 1/2; Karlene is 8 1/2, and Michele is 6 1/2 years of age.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
The mother has maintained regular contact with her children. She CT Page 16714 completed substance abuse counseling and substance abuse treatment. She also completed domestic violence and parenting classes. In March 2001, the respondents resumed couples counseling. She, however, did not make substantial progress in controlling the effects of her schizophrenia. Between the summer of 2000 and August 2001, she failed to take the medication for this illness and, as discussed supra, the court finds that she will not continue on the medication.
The father's visitation with his children was not consistent, especially when that visitation occurred at Family Services of Waterbury. He completed substance abuse counseling at MFI and, as found supra, there is little reason to believe that he will resume drug abuse. The father has not successfully completed domestic violence or anger management classes. Here, however, domestic violence was not chronic and was more a symptom of the parties' lack of insight into the mother's mental illness than a cause of the break-up of their family. The father continues to lack insight into the mother's mental illness or her need to take medication for it.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
Neither parent has been prevented from maintaining a meaningful relationship with the children by the unreasonable act or conduct of the other parent or the unreasonable act of any other person or by their economic circumstances. DCF did refuse to pay for the father's counseling at Family Services of Waterbury. However, there was no evidence that this resulted in the father not attending counseling sessions or, directly or indirectly, in the father's failure to maintain a meaningful relationship with his children.
 B.
Although in determining whether to grant a petition to terminate parental rights the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d), now § 17a-112
(k); In re Tyscheicka H., 61 Conn. App. 19, 26, 762 A.2d 916 (2000); "[t]he seven factors . . . serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered." In re Quanitra M., 60 Conn. App. 96, 104, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). "The trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . CT Page 16715 purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 208,742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re ShyinaB., 58 Conn. App. 159, 167, 752 A.2d 1139 (2000). "In addition, the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider. . . ." (Internal quotation marks omitted.) In re Savanna M., 55 Conn. App. 807, 816, 740 A.2d 484 (1999).
In addition to the foregoing facts, the court has carefully considered Dr. Meier's April 2001 psychological evaluation of the respondents, the children and the foster mother, mindful that "[t]he psychological testimony from professionals is rightly accorded great weight in parental termination proceedings." (Internal quotation marks omitted.) Id. The court, however, is also mindful that "[i]n a case tried before a court the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Citations omitted; internal quotation marks omitted.) In reCarissa K., 55 Conn. App. 768, 781-82, 740 A.2d 896 (1999).
The court finds the following additional facts. In her April 2001 evaluation with Dr. Meier, the mother was less vague and disorganized in her thinking than she was at the time of her 1999 evaluation. However, she continued to "exhibit some loose associations, tangential thinking, and unusual comments." In her brief testimony before the court, the mother appeared to be coherent.
At the time of his April 2001 evaluation with Dr. Meier, Bartholomew was 9 1/2 years old. He had become somewhat nervous and sometimes has difficulty sitting still. He tends to be a follower rather than a leader, and does not always get along with children his same age. He can be a poor loser in games. Bartholomew is easily distracted, does not pay attention and seems to have trouble understanding instructions at times. He often interrupts adults when they are talking, but is generally not rude or aggressive.[5] He visits with his mother every week, looks forward to the visits and would like to see her even more often. He does CT Page 16716 not see his father as often and is unhappy about this. He misses his parents and would like to continue visiting with them. In fact, he would like to return to their home.
Dr. Meier, in effect, recommends termination of parental rights and an open adoption by the current foster mother. Recognizing that open adoption is a consensual arrangement, however, Dr. Meier suggests that long-term foster care is also an option to be considered.
Karlene and Michelle are closely bonded to their foster mother and wish to remain with her. They are doing very well in her care. However, both girls wish to continue to visit with their mother. Michelle also wishes to visit with her father. The girls would suffer a sense of loss if they no longer were able to visit with their mother. However, they would suffer a more profound sense of loss if they were to lose their foster mother.
Above all, Karlene and Michelle require and deserve continuity and stability in their environment. This they may have only with the only reliable mother they have ever had, their foster mother. By clear and convincing evidence, the court finds that it is in the best interests of Karlene and Michelle for the respondents' parental rights to be terminated. Karlene and Michelle have been in foster care for over two years. There is no reason to delay such an adoption and risk "[t]he well-known deleterious effects of prolonged temporary placement on the child. . . ." In re Juvenile Appeal (83-CD), 189 Conn. 276, 292,455 A.2d 1313 (1983).
Bartholomew's circumstances, however, are somewhat different than his sisters. He is closely bonded to his father and has a clear bond to his mother. He is less closely bonded to his foster mother at this time. He has emotionally separated somewhat from his sisters. Were Bartholomew not able to maintain contact with his parents he would suffer a tremendous sense of loss. On the other hand, it would not be in any of the children's interests to separate them. Considering all circumstances, the court is unable to find that it is in the best interests of Bartholomew, a boy nearly ten years of age, for the respondents' parental rights to be terminated.
"This is not to say that granting the petition and terminating the respondent's parental rights may not, in fact, be in [Bartholomew's] best interests. The position in which the facts of this case leave [him] is imperfect. Languishing in foster care is not in [his] best interests. Inre Christina V., 38 Conn. App. 214, 660 A.2d 863 (1995). . . . It is to say that the petitioner has not proved by clear and convincing evidence that terminating the respondent's parental rights at the time of trial CT Page 16717 was in [Bartholomew's] best interests." In re Shawn B., Superior Court, Child Protection Session at Middletown (Nov. 2, 2000); see also In reChabelle S., Superior Court, Juvenile Matters at Hartford (December 4, 2000) (best interests of child determined as of the last day of trial).
 IV
With respect to the respondents' motion to revoke the commitment of their children to DCF, the rule is that "[o]n a petition to revoke commitment, once the petitioner has submitted sufficient evidence to show that the cause for commitment no longer exists, the burden shifts to the state to prove that it would not be in the best interests of the child to be returned to his or her natural parent." In re Juvenile Appeal (85-1),3 Conn. App. 158, 160, 485 A.2d 1355 (1985).
The respondents argue that the reason that DCF opened its file in this case in 1998 was the educational neglect of Bartholomew and that such neglect is no longer an issue. The threshold issue on a petition to revoke, however, is not whether the reason that DCF opened its file no longer exists but whether the "cause for commitment no longer exists."Id. The cause for commitment of the children included the issues surrounding the mother's mental health problems. As discussed supra, these problems continue to plague the respondents. Because the cause for the commitment still exists, the motion to revoke is denied.
 V
With respect to Bartholomew, the petition to terminate parental rights is denied. With respect to Michelle and Karlene, the petition is granted as to both respondents. The court terminates the respondents' parental rights. The foster mother shall be given the first opportunity to adopt Michelle and Karlene. The Commissioner of the Department of Children and Families is appointed statutory parent for Michelle and Karlene for the purpose of securing a permanent adoptive family for them. The commissioner shall file with this court no later than 30 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Dated at Middletown this 19th day of December, 2001.
BY THE COURT
Bruce L. LevinJudge of the Superior Court